# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JEREMY JAMES CHANNELLS,

        Defendant-Appellant.

UNPUBLISHED
October 22, 2015


No. 321333
Wayne Circuit Court
LC No. 12-009342-FH

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LARRY ROBERT DROEGE,

        Defendant-Appellant.

No. 321450
Wayne Circuit Court
LC No. 12-009342-FH

---

Before: FORT HOOD, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

In **Docket No. 321333**, defendant, Jeremy James Channells, appeals as of right his jury trial convictions for two counts of misconduct in office, MCL 750.505, and one count of willful neglect of duty, MCL 750.748. Channells was sentenced to three years' probation and restitution in the amount of $22,405.04 on the convictions. In **Docket No. 321450**, defendant, Larry Robert Droege, appeals as of right his jury trial convictions of misconduct in office, MCL 750.505, and willful neglect of duty, MCL 750.748. Droege was sentenced to 18 months' probation and restitution of $4,517 on the convictions. We affirm.

These consolidated appeals arise out of charges of misconduct in office and willful neglect of duty brought against Romulus police officers Channells and Droege with regard to a vice investigation conducted from 2010 to 2011, at the Landing Strip, located at 36432 Goddard Road, Romulus, Michigan. Specifically, the officers were charged with misconduct in office based on "lewd, immoral, and/or sexual act(s) with another for personal gratification" and the misuse of forfeiture funds during their investigation of prostitution and other illegal activity at

-1-

the Landing Strip and another "gentleman's club" identified as Subi's Place in Southgate, Michigan. They were also charged with the misdemeanor of willful neglect of duty for their failure to enforce various laws, statutes or ordinances "in connection [with] certain improper and/or illegal activities" at the Landing Strip. Channells was also charged with a second count of misconduct in office premised on the filing of a false police report.

Channells and Droege challenge the admission of certain evidence and testimony at trial elicited from John Leacher, Joyce Clay, Michael Ondejko and Dale Smith, critical of the propriety and effectiveness of their investigative efforts at the Landing Strip. In part, Channells and Droege assert that the opinion testimony of these individuals improperly encompassed the ultimate issue of guilt in this case. Droege further challenges the admission of evidence regarding his failure to attend an out-of-state seminar on vice investigations, which he characterizes as "bad acts" evidence, the use of evidence pertaining to Channells's behavior in the investigation involving Subi's Place, as well as the trial court's refusal to admit evidence regarding audiotapes and evidence involving Mohamad Bazzi to explain the termination of the Landing Strip investigation. Channells further contends that the failure of defense counsel to object to some of this evidence or testimony comprised the ineffective assistance of counsel.

To preserve an issue pertaining to the admissibility of evidence for appellate review, a party is generally required to object at the time of admission. *People v Knox*, 469 Mich 502, 508; 674 NW2d 366 (2004). Further, the objection must be premised on the same ground at trial as is asserted on appeal. MRE 103(a)(1); *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). Defense counsel did object to testimony by Ondejko and Clay, preserving those issues for appeal. Defense counsel did not object to the testimony complained of on appeal with regard to Leacher and Smith and it is, therefore, not preserved. With regard to claims regarding the admissibility of certain evidence, objections were made regarding the alleged "bad acts" evidence pertaining to Droege's failure to attend a training seminar and testimony was taken before the trial court denied admission of the tapes and reports of Bazzi; preserving the issues for appellate review. Errors alleged regarding the admissibility of evidence pertaining to Channells's conduct in another investigation is not sufficiently elucidated to identify the testimony or evidence complained of and, therefore, we treat the issue as not preserved. To preserve a claim of ineffective assistance of counsel, a defendant is required to file a motion for a new trial or a *Ginther*[1] hearing. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). Because a motion for a new trial or *Ginther* hearing was not requested, the ineffective assistance of counsel claim is not preserved.

When an issue regarding the admissibility of evidence is properly preserved, this Court reviews the trial court's decision for an abuse of discretion. *People v Crawford*, 458 Mich 376, 383; 582 NW2d 785 (1998). "An abuse of discretion occurs when the trial court renders a decision falling outside the range of principled decisions." *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012). Unpreserved claims of evidentiary error are reviewed for plain error affecting substantial rights. *People v Whittaker*, 465 Mich 422, 426; 635 NW2d 687 (2001).

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *Petri*, 279 Mich App at 410. The review of unpreserved claims of ineffective assistance of counsel is "limited to mistakes apparent on the record." *Id.*

As discussed in *Aldrich*, 246 Mich App at 114 (citations omitted):

Generally, all relevant evidence is admissible at trial. Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence. Under this broad definition, evidence is admissible if it is helpful in throwing light on any material point. However, even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence.

Specifically, Channells and Droege assert that opinion testimony elicited from Leacher improperly encompassed the ultimate issue of guilt. Testimony at trial encompassed statements by Leacher acknowledging the obligation to follow the orders of an officer of superior rank, but denying blind adherence. The following statements by Leacher regarding his concerns after reviewing the investigative file and reports are also challenged:

Initially I was quite frankly shocked to see that officers had engaged in unprotected oral sex with dancers at The Landing Strip on multiple occasions. That was the first thing that jumped out at me.

\* \* \*

The lack of detail in the reports. It appeared that for the better portion of the course of the entire investigation that there was nothing done to further the investigation. Nobody was, to my recollection, was ever concretely identified. Dancers were described by height, build, maybe stage names, but no indication in the report of any concrete identification of anybody that they were dealing with.

Opinion testimony was also elicited from Clay, following her explanation of the policies and procedures to obtain forfeiture monies and to document its expenditure. After initial objections to the form of the query regarding the characterization of an action as "wrong" versus "illegal," Clay indicated she would refuse to follow a directive, "If I knew it to be wrong. . . ."

Channells and Droege also challenge testimony elicited from Smith by the prosecutor regarding his response to a review of the documentation of the use of forfeiture funds:

What struck me as unusual was the aggregate amount of chits. The amount of money that was being paid to confidential informants, the types of purchases that were made with chits, and that were being submitted for payment.

Also contested is the following testimony elicited from Ondejko. Following questioning regarding proper police methods and tools in conducting vice investigations, Ondejko responded:

> Well, I would expect the reports to reflect who was there, what they – what their observations were that day that might indicate that this is not just a rouge dancer, but this is a conspiracy, a group of individuals working together. I would expect to see some recordings. The officers as they talked to dancers have the capability of recording the solicitations that go on. Photographs, surveillance photographs from the surveillance team of various individuals.

Specifically, Channells and Droege challenge the exchanges between the prosecutor and Ondejko where Ondejko denied the propriety of police officers engaging in sex acts with dancers at the Landing Strip as an investigative tool, explaining, "It's against the law, first and foremost. And, secondarily, it's a victimization of the girl. It's an unacceptable police practice." Also challenged are statements by Ondejko criticizing the failure to use backup for surveillance purposes in this investigation and the use of a confidential informant to engage in sex acts with a dancer. Specifically, Ondejko stated:

> Well, unprotected sex could be a death sentence. More – well, maybe not more importantly, but simply in a case like this, the solicitation is the same crime. It's not necessary to go to that extent either. . . . With an informant there's a little different guidelines for what they can do and can't do than what an undercover officer can do also. You know, if, if – I have had informants engage in, in acts I would never have an officer engage in. But I think the, the most important reason why is the solicitation would be sufficient. So I don't see any reason for an officer to go beyond that.

"The proponent of evidence bears the burden of establishing its relevance and admissibility." *People v Martin*, 271 Mich App 280, 316; 721 NW2d 815 (2006). "While positive proof of guilt is not required, there must be evidence on each element of the crime charged or evidence from which those elements may be inferred." *People v Goode*, 106 Mich App 129, 136; 308 NW2d 448 (1981). Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. The critical inquiry is whether the proffered evidence helps to prove a material fact at issue. *People v Martzke*, 251 Mich App 282, 293; 651 NW2d 490 (2002). Evidence that is useful in shedding light on any material point is admissible. *Aldrich*, 246 Mich App at 114. To be material, evidence does not need to relate to an element of the charged crime or an applicable defense. *People v Brooks*, 453 Mich 511, 518; 557 NW2d 106 (1996). Instead, it is the relationship of the evidence to the elements of the charged offenses, the theories of admissibility, and the defenses asserted that governs. *People v Yost*, 278 Mich App 341, 403; 749 NW2d 753 (2008).

The defense did not deny that Channells and Droege spent the identified amount of forfeiture money in the manner alleged. Nor do they deny having engaged in sexual acts with dancers at the Landing Strip. Rather, their defense was that they were instructed to engage in these behaviors by their supervisor, the chief of police, and that their actions were, therefore, sanctioned as proper investigative tools. Hence, premised on the charges brought and the

defenses asserted, the prosecutor was required to demonstrate that Channells and Droege engaged in behavior that was contrary to their professional role as police officers and which did not comport with proper or acceptable methodologies for vice investigations. The challenged testimony was admissible to demonstrate the deficiencies in the methods employed by Channells and Droege in failing to properly document information obtained during their investigation such as the identities of the dancers, the presence of Subi Saad in the establishment as the target of the investigation, the use of forfeiture monies without adequate explanation, and the lack of evidence to facilitate prosecution of the crimes observed.

In accordance with MRE 701, the challenged testimony was admissible. Specifically:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue. [MRE 701.]

It is permissible for a witness to testify in the form of an otherwise admissible opinion or inference even though it may embrace an ultimate issue to be decided by the trier of fact. MRE 704. The challenged testimony elicited from Leacher, Smith and Ondejko involved individuals with knowledge of police procedures and experience in vice investigations. It was, thus, permissible for them to express an opinion or inference premised on their own perceptions regarding how the investigation proceeded and where it led. See MRE 701; *People v Daniel*, 207 Mich App 47, 57; 523 NW2d 830 (1994). With reference to Joyce, she worked for the same police department and had knowledge of the proper handling of forfeiture funds. The query posed to her similarly addressed an issue in the case – whether Channells and Droege could explain or excuse their actions simply by asserting they were following orders. Further, Joyce's testimony was arguably beneficial to Channells and Droege when on cross-examination she suggested that she would follow a superior officer's directive if she believed it to be truthful and based on the superior officer's experience.

Channells and Droege further assert the trial court erred by permitting other bad acts evidence to be admitted at trial. Specifically, they reference evidence regarding Droege's failure to attend an out-of-state seminar and Channell's behavior while investigating another establishment, Subi's Place. Initially, we note that the challenged evidence was not presented in accordance with MRE 404(b). In terms of Droege's failure to attend a seminar, the evidence was admitted to contradict Droege's testimony or assertions that he lacked proper training, or failed to receive adequate training, in vice investigations. Testimony was then elicited from Droege by the prosecutor that in April 2010, accompanied by Channells and other officers, Droege flew to Miami to attend a seminar paid for by the city of Romulus on advanced narcotics and vice investigations. He acknowledged attending only 45 minutes of the first class offered for the five-day seminar. As such, the elicited testimony was correctly treated by the trial court as comprising proper impeachment evidence and not bad acts evidence.

Error is also asserted pertaining to testimony elicited regarding Channells's and Droege's involvement and behavior at another location, Subi's Place, during the investigation. Once again, the evidence admitted is mischaracterized as bad acts evidence. Shelby testified regarding

the various dates and activities engaged in by Channells and Droege during their investigation, some of which admittedly occurred at Subi's Place rather than the Landing Strip. The confidential informant confirmed the activities at both locations. The activity at Subi's Place was an acknowledged part of their alleged investigation and efforts to link Saad to criminal activity. In other words the evidence was to show the behavior of Droege and Channells in their investigation and was not used to demonstrate misconduct in a separate investigation or to suggest evidence of their character, merely how they conducted their current investigation.

Channells and Droege contend that the evidence they characterize as improper bad acts evidence was more prejudicial than probative and, as such, should not have been admitted. The seminar evidence was proper impeachment evidence to contradict Droege's testimony that he was not afforded training in vice investigations. Evidence regarding conduct at Subi's Place was admitted to demonstrate the impropriety of the investigative methods used by Droege and Channells. In addition, with reference to Channells, the underlying acts for the second charge of misconduct in office were premised on the filing of a false police report based on acts that occurred on May 6, 2010, at Subi's Place. The probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. MRE 403. As discussed in *People v Murphy (On Remand)*, 282 Mich App 571, 582-583; 766 NW2d 303 (2009):

> All relevant evidence will be damaging to some extent. The fact that evidence is prejudicial does not make its admission unfair. Unfair prejudice exists only where either a probability exists that evidence which is minimally damaging in logic will be weighed by the jurors substantially out of proportion to its logically damaging effect, or it would be inequitable to allow the proponent of the evidence to use it. [Citations and quotation marks omitted.]

Contrary to their assertions on appeal, the evidence admitted was more than marginally probative regarding the manner in which Droege and Channells engaged in their investigation and whether their actions were for a legitimate law enforcement goal or personal aggrandizement. There is nothing to suggest or indicate that the jury assigned preemptive weight to these incidents or that the evidence injected considerations among the jury extraneous to the merits of the case.

Channells and Droege also allege error in the trial court's denial of their request to admit evidence regarding a scandal pertaining to the mayor's acceptance of bribes as the alleged impetus for termination of the Landing Strip investigation. They contend that Bazzi could have provided testimony that he delivered money to the mayor to rebut the prosecutor's contention that the Landing Strip investigation was not legitimate and ended for no particular reason. They further assert the information was exculpatory because it demonstrated a financial link between Saad and the mayor, who controlled the police department. The trial court determined, before the initiation of trial and again after allowing Bazzi to be questioned outside the presence of the jury during the course of the trial, that the proffered testimony was not relevant or exculpatory and deemed it inadmissible.

Primarily the proffered testimony was to demonstrate and contradict any assertion by witnesses for the prosecution that there was no known or specific reason for the cessation of the Landing Strip investigation. The evidence was irrelevant as the issue at trial was not the reason for the cessation of the investigation but rather whether the investigation was legitimate and

whether the manner in which it was conducted was consistent with proper police investigative procedures. The implication that the mayor, through his acceptance of bribes, could have influenced the course of the investigation is not relevant to how Channells and Droege behaved during the course of the investigation. The admission of the evidence from Bazzi would merely have added another layer of graft and corruption to an investigation already mired in questionable activity and would not have served to provide the jury with information relevant to the issues to be resolved. Although Channells and Droege fervently asserted the exculpatory nature of this evidence, such argument is without merit. Exculpatory evidence is defined as "[e]vidence tending to establish a criminal defendant's innocence." *Black's Law Dictionary* (10th ed). There is nothing in Bazzi's proffered testimony that establishes the innocence of either Channells or Droege with reference to the crimes charged. The mayor's graft and potential influence over termination of the investigation has no relevance to how the investigation was conducted while it was pending. As such, the trial court did not err in refusing to admit the evidence.

Finally, Channells contends that the failure of defense counsel to object to the referenced testimony by Leacher comprised ineffective assistance of counsel. As discussed previously by this Court:

> Effective assistance of counsel is presumed and defendant bears the burden of proving otherwise. To succeed on a claim of ineffective assistance of counsel, the defendant must show that, but for an error by counsel, the result of the proceedings would have been different, and that the proceedings were fundamentally unfair or unreliable. The defendant bears a "heavy burden" on these points. Defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. [*Petri*, 279 Mich App at 410-411 (citations omitted).]

"This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Garza*, 246 Mich App 251, 255; 631 NW2d 764 (2001). As noted, *supra*, the challenged testimony was permissible as an expression of an opinion or inference premised on Leacher's own perceptions regarding how the investigation was conducted and how it proceeded. See MRE 701; *Daniel*, 207 Mich App at 57. A claim of ineffective assistance of counsel cannot be premised on an attorney's failure to make a futile objection. *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998). In addition, there has been a failure to demonstrate a reasonable probability that the outcome of his trial would have been different, but for counsel's alleged error, given the plethora of evidence supporting the jury's verdict. See *People v Toma*, 462 Mich 281, 302-303; 613 NW2d 694 (2000).

Channells and Droege next assert error by the trial court in providing the jury with a legal dictionary, particularly without having first consulted counsel when the request was received. They further contend that the trial court's instructions to the jury were deficient because they failed to define legal terms necessary to determine the elements to be proved for the charges brought pursuant to MCL 750.505.

In order to preserve a claim of instructional error, a defendant must object or request the provision of an instruction before the jury initiates deliberations. MCL 768.29; MCR 2.512(C). The specific basis for the objection must be stated. *People v Sabin (On Second Remand)*, 242 Mich App 656, 657; 620 NW2d 19 (2000) (citation omitted). The behavior challenged on appeal involves the trial court's provision of a legal dictionary to the jury, upon its request, without having first consulted trial counsel. When defense counsel learned of this action, they objected and expressed their concerns to the trial court. Because the first opportunity for counsel to object to the trial court's action occurred after-the-fact, we find that the issue is preserved for appellate review. See *People v Darden*, 230 Mich App 597, 601 n 3; 585 NW2d 27 (1998). With regard to the general assertion of error pertaining to the jury instructions, defense counsel specifically indicated a lack of objection when queried by the trial court. The failure to object to jury instructions serves as a waiver of error unless relief is necessary to avoid manifest injustice. MCL 768.29; *Sabin*, 242 Mich App at 657. "Manifest injustice occurs where the erroneous or omitted instruction pertains to a basic and controlling issue in the case." *People v Torres*, 222 Mich App 411, 423; 564 NW2d 149 (1997).

Claims of instructional error are reviewed de novo. *People v Fennell*, 260 Mich App 261, 264; 677 NW2d 66 (2004). Unpreserved instructional error issues are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

In accordance with *People v Kowalski*, 489 Mich 488, 501-502; 803 NW2d 200 (2011):

> A criminal defendant has a constitutional right to have a jury determine his or her guilt from its consideration of every essential element of the charged offense. A defendant is thus entitled to have all the elements of the crime submitted to the jury in a charge which [is] neither erroneous nor misleading. . . . Instructional errors that omit an element of an offense, or otherwise misinform the jury of an offense's elements, do not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. Accordingly, an imperfect instruction is not grounds for setting aside a conviction if the instruction fairly presented the issues to be tried and adequately protected the defendant's rights. [Citations and quotation marks omitted.]

A further matter for challenge is the trial court's acknowledged provision to the jury of a Black's Law Dictionary following a request from the jury. When counsel was apprised of this action, it was suggested that a "problem" existed with regard to the "instruction about corrupt intent because it has a string of words." Notably, when queried by the trial court regarding objections to the instructions upon completion, Channells's counsel specifically denied concerns, specifically indicating, "I think that the two proposed instructions well sums it up with our comments that we made earlier." Droege's counsel also indicated the absence of any objection.

Initially, addressing the general implication that the instructions were deficient premised on the failure to define legal terms, we find the claim is without merit. The trial court provided the jury with instructions pertaining to the charges of misconduct in office. First, the relevant legal terms, such as malfeasance, misfeasance and corrupt intent were defined by the trial court. Second, any claim of error regarding the content of the instructions has been waived. "Waiver has been defined as the intentional relinquishment or abandonment of a known right." *People v*

-8-

*Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *Id.* Both defense counsels specifically asserted that they had no objections to the instructions as provided by the trial court to the jury. Such approval extinguished any purported error. *Id.* at 216.

With regard to the assertion of error pertaining to the trial court's provision of a legal dictionary to the jury, citing federal court decisions, this Court has indicated that "a jury's use of a dictionary to define a relevant legal term is error, but is not prejudicial per se." *People v Messenger*, 221 Mich App 171, 176; 561 NW2d 463 (1997), citing *United States v Gillespie*, 61 F3d 457, 459 (CA 6, 1995). In this instance, there was no inquiry of the jury when rendering their verdict regarding whether the dictionary was used or what words were defined. It is mere speculation by counsel that the dictionary was used to define the terms pertaining to corrupt intent. Even if this assumption is correct, it is difficult to ascertain how Channells or Droege were prejudiced by the jury's use of a legal dictionary to ascertain the definition of a legal term, consistent with that provided within the instructions. *Messenger*, 221 Mich App at 176-177.

The jury was provided with a copy of the instructions. The trial court's definition of "corrupt intent" was "substantively identical to the dictionary definition," using the same words to define the term. *Messenger*, 221 Mich App at 176-177. "Under such circumstances, there was no prejudice even if the jurors may have used the dictionary definition." *Id.* at 177.

Droege also asserts that there was insufficient evidence adduced to sustain his conviction for misconduct in office. He contends that the failure to identify the existence of any specific police department policy or procedure that was violated precluded conviction on this charge.

Claims of insufficient evidence are reviewed de novo. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001). "[W]hen determining whether sufficient evidence has been presented to sustain a conviction, a court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Hunter*, 466 Mich 1, 6; 643 NW2d 218 (2002) (citation omitted).

The statutory provision governing misconduct in office is MCL 750.505, which provides:

> Any person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this state, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 5 years or by a fine of not more than $10,000.00, or both in the discretion of the court.

"The offense of misconduct in office was an indictable offense at common law." *People v Waterstone*, 296 Mich App 121, 133; 818 NW2d 432 (2012) (citation omitted). As discussed by our Supreme Court in *People v Perkins*, 468 Mich 448, 456; 662 NW2d 727 (2003):

> At common law, misconduct in office was defined as "corrupt behavior by an officer in the exercise of the duties of his office or while acting under color of his office." *People v Coutu*, 459 Mich 348, 354; 589 NW2d 458 (1999) . . ., quoting

Perkins & Boyce, Criminal Law (3d ed), p 543. An officer could be convicted of misconduct in office (1) for committing any act which is itself wrongful, malfeasance, (2) for committing a lawful act in a wrongful manner, misfeasance, or (3) for failing to perform any act that the duties of the office require of the officer, nonfeasance. Perkins, p 540.

"An indictable common-law offense can be charged by the prosecution pursuant to MCL 750.505 unless punishment for that offense is otherwise expressly provided for by statute." *Waterstone*, 296 Mich App at 134 (citation omitted). "It appears that not only violations of statutory duties are indictable, but also discretionary acts performed with an improper or corrupt motive are subject to indictment." *Coutu*, 235 Mich App at 705 (citation omitted). As discussed previously by this Court:

The offense itself, misconduct in office, is defined as corrupt behavior by an officer in the exercise of the duties of his office or while acting under color of his office. It encompasses malfeasance, which is the doing of a wrongful act, misfeasance, which is the doing of a lawful act in a wrongful manner, and nonfeasance, which is the failure to do an act required by the duties of the office. It does not encompass erroneous acts done by officers in good faith or honest mistakes committed by an officer in the discharge of his duties. [*Id.* at 705-706 (citations omitted).]

Terms relevant to corrupt intent have been defined or explained as follows:

"Corruption" in this context means a "sense of depravity, perversion or taint." "Depravity" is defined as "the state of being depraved" and "depraved" is defined as "morally corrupt or perverted." "Perversion" is "the act of perverting," and the term "perverted" includes in its definition "misguided; distorted; misinterpreted" and "turned from what is considered right or true." The definition of "taint" includes "a trace of something bad or offensive." Pursuant to the definitions, a corrupt intent can be shown where there is intentional or purposeful misbehavior or wrongful conduct pertaining to the requirements and duties of office by an officer. The corrupt intent needed to prove misconduct of office does not necessarily require an intent for one to profit for oneself. [*Id.* at 706-707 (citations omitted).]

The charge of misconduct in office pertaining to Droege consisted of allegations that "on or between January 2010 up to and including February 2011, willfully and intentionally engaged in lewd, immoral, and/or sexual act(s) with another for personal gratification in or around [The Landing Strip] in exchange for the payment of U.S. currency received by him in his official capacity of employment through Romulus Police Department-generated expense reports and corresponding support documentation submitted and presented by defendant to the City of Romulus Police Department and/or City of Romulus in an effort to seek monetary reimbursement(s) and/or document expenditure(s) of U.S. currency previously provided. . . ." Droege argues that the absence of any policies or procedures for the Special Investigations Unit dictating restrictions on his behavior precludes a conviction on the charge and suggests that the allegation that he engaged in sexual acts for personal gratification does not rise to the level of

-10-

"depravity, perversion or taint" necessary to establish misconduct in office. Droege contends on appeal, "the People also failed to identify an affirmative duty, by statute or otherwise, to arrest, to not have any gratification from an officer's work, and to not engage in lewd conduct – even when undercover."

In accordance with the elements of misconduct in office as elucidated in *Perkins*, 468 Mich 456, there is no dispute that Droege was acting as an undercover police officer for the Romulus Police Department when the actions alleged occurred. Specifically:

> The mere coincidence that a crime has been committed by one who happens to be a public officer is not sufficient to establish official misconduct. For this offense it is necessary not only that the offender be an officer, or one who presumes to act as an officer, but the misconduct, if not actually in the exercise of the duties of his office, must be done under color of his office. On the other hand the act of one who is an officer, which act is done because he is an officer or because of the opportunity afforded by that fact, is under color of his office despite his gesture of removing his badge plus his statement that he is not acting in the name of the law. [*Id.* at 456-457 (citation omitted).]

Rather, the dispute centers on whether the prosecutor established that the alleged acts were done with "corrupt intent." Irrespective of the existence of policies or procedures for the Special Investigations Unit, Droege as a police officer was under a continuing duty to uphold the law and "to avoid conduct unbecoming an officer." *People v Hardrick*, 258 Mich App 238, 247; 671 NW2d 548 (2003). "It is corrupt for an officer purposely to violate the duties of his office." *Id.* (citation and emphasis omitted). Droege admitted to participating in sexual acts with dancers at the Landing Strip in exchange for money on more than one occasion. As acknowledged by various witnesses, it was unnecessary to engage in sexual acts as solicitation of the acts in exchange for money was sufficient to establish a crime and engagement in the sexual acts served only to further victimize the women involved. Droege admitted while under oath that part of the investigation into the Landing Strip involved concerns regarding human trafficking of women coerced into prostitution. His involvement, however, went a step further as demonstrated by the following colloquy with the prosecutor:

> *Q.* You went into these bars and had, engaged in sex acts with these women that were potentially victims of human trafficking. Is that true, yes or no?
>
> *A.* Yes. That's potentially true.

He also observed other individuals engaged in such acts, on a multitude of occasions over a year-long period, without taking any action or even fully documenting the events. "[A] corrupt intent can be shown where there is intentional or purposeful misbehavior or wrongful conduct pertaining to the requirements and duties of office by an officer." *Coutu*, 235 Mich App at 706. It is routinely recognized that a police officer has a duty to uphold and enforce the law. See *Longmoor v Nilsen*, 285 F Supp 2d 132, 144 (D Conn, 2003); *United States v Rosario*, 237 F Supp 2d 242, 246 (ED NY, 2002). Based on Droege's engagement in sexual acts in exchange for money, coupled with the failure to adequately and consistently document the use of forfeiture

funds during the investigation, sufficient evidence was adduced to demonstrate that Droege engaged in malfeasance to sustain his conviction for misconduct in office.

Finally, Droege contends the prosecution abused its charging authority, asserting the acts charged should have been restricted to the misdemeanor statute, MCL 750.478, and that the facts of the case did not properly conform to the elements or requirements necessary to establish a separate charge under MCL 750.505.

Preserved claims of prosecutorial misconduct are reviewed de novo to determine whether a defendant was denied a fair and impartial trial. *Id.* at 453. Further:

> Discretion is afforded the prosecutor by the fact that evidence is available to support a charge under either statute. That discretion is abused only if a choice is made for reasons that are "unconstitutional, illegal, or ultra vires." Courts thus review a charging decision under an "abuse of power" standard, questioning whether a prosecutor has acted in contravention of the constitution or the law. [*People v Barksdale*, 219 Mich App 484, 488; 556 NW2d 521 (1996) (citation omitted).]

A prosecutor has two important, and at times competing, obligations. He or she is required to "prosecute with earnestness and vigor," while simultaneously ensuring that justice be done. See *Cone v Bell*, 556 US 449, 469; 129 S Ct 1769; 173 L Ed 2d 701 (2009); *Strickler v Greene*, 527 US 263, 281; 119 S Ct 1936; 144 L Ed 2d 286 (1999). The prosecutor is not merely a party to the controversy, *Strickler*, 527 US at 281, rather he or she is a representative of "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Id*. Consequently, the lower court and the prosecutor have a duty to ensure that a defendant receives a fair trial. *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996).

It is a well-recognized precept:

> Under our system of government, the prosecuting attorney is an elected official and is responsible for his actions to the citizens of his county. Const 1963, art 7, s 4. As the chief law enforcement officer in the county, the prosecuting attorney, not the police nor the court, decides the initial charge. So also is his decision to add a count discretionary and unless this discretion is clearly abused, it should stand. [*People v Matulonis*, 60 Mich App 143, 149; 230 NW2d 347 (1975).]

See also *People ex rel Leonard v Papp*, 386 Mich 672, 683; 194 NW2d 693 (1972). It is within the duty and authority of a prosecutor to determine the initial charges against a defendant or to amend new charges. MCR 6.112(H); *People v Nyx*, 479 Mich 112, 124-125; 734 NW2d 548 (2007); *Papp*, 386 Mich at 682-684. As discussed in *United States v Cespedes*, 151 F3d 1329, 1332-1333 (CA 11, 1998):

> "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v Hayes*, 434 US 357, 364; 98 S Ct 663; 54 L Ed 2d 604 (1978). Indeed, the federal courts have long recognized "that when an act

violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *United States v Batchelder*, 442 US 114, 123-124; 99 S Ct 2198; 60 L Ed 2d 755 (1979) (citations omitted). Moreover, in selecting which charge to file, "[a] prosecutor may be influenced by the penalties available upon conviction." *United States v Harden*, 37 F3d 595, 599 (CA 11, 1994) (quoting *Batchelder*, 442 US at 125).

The Supreme Court has unambiguously upheld the prosecutor's ability to influence the sentence through the charging decision. In *United States v Batchelder*, for example, the Court found that no improper delegation of legislative power to the executive results from prosecutorial discretion to charge a defendant with either one of two statutes with identical elements but differing maximum penalties:

> The provisions at issue plainly demarcate the range of penalties that prosecutors and judges may seek and impose. In light of that specificity, the power that Congress has delegated to those officials is no broader than the authority they routinely exercise in enforcing the criminal law. Having informed the courts, prosecutors, and defendants of the permissible punishment alternatives available under each Title, Congress has fulfilled its duty. *Id*. at 126 (citation omitted).

As such, prosecutors are permitted considerable discretion in determining what criminal charges to bring. *Id.* at 123-124; *Grant v Rivers*, 920 F Supp 769, 787 (ED Mich, 1996). "Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution neither is he entitled to choose the penalty scheme under which he will be sentenced." *Batchelder*, 442 US at 125.

In the circumstances herein, the prosecutor did not abuse her authority or engage in misconduct by charging Droege under two separate statutory provisions, MCL 750.478 and MCL 750.505. The acts establishing the charges for MCL 750.478 involved nonfeasance in failing to enforce various laws and ordinances that Droege observed being violated. In contrast, the acts relied upon for MCL 750.505 are distinguishable, involving specific allegations of malfeasance by Droege. As demonstrated by both the decision to bind over Droege on the charges and his subsequent conviction of those charges by a jury, Droege's challenge to the prosecutor's charging authority is without merit. See *People v Bennett*, 290 Mich App 465, 481; 802 NW2d 627 (2010) ("[T]he presentation of sufficient evidence to convict at trial renders any erroneous bindover decision harmless.").

Droege suggests wrongdoing by the prosecutor in deciding what charges to bring. Despite the inherent implication, there is, however, no evidence that the prosecutor was vindictive in the use of her charging powers by charging crimes that were not supported by the evidence. Premised on his jury convictions, there was evidence to support the charges. "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file . . . generally rests entirely in [the prosecutor's] discretion." *Bordenkircher*, 434 US at 364. "A mere

allegation the government was" acting in a vindictive manner "is not enough to establish vindictiveness." *United States v Hirsch*, 360 F3d 860, 864 (CA 8, 2004). "In order to succeed on a claim of prosecutorial vindictiveness, a defendant must affirmatively show through objective evidence that the prosecutorial conduct at issue was motivated by some form of prosecutorial animus, such as a personal stake in the outcome of the case or an attempt to seek self-vindication." *United States v Jarrett*, 447 F3d 520, 525 (CA 7, 2006) (citations and quotation marks omitted). Because the election to charge Droege under both MCL 750.505 and MCL 750.478 was clearly within the allowable parameters of discretion by the prosecutor, Droege's claim of error is without merit.

Affirmed.

/s/ Karen M. Fort Hood
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly